UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| v. | ) | No. 04 CR 572 |
| | ) | |
| **JOSEPH DOYLE, and** | ) | Judge Rebecca R. Pallmeyer |
| **MARY CAVANAUGH** | ) | |

**MEMORANDUM OPINION AND ORDER**

Defendant Mary Cavanaugh has been charged in a four-count indictment with mail fraud under the Hobbs Act, 18 U.S.C. §§ 1341 and 1342, in connection with Chicago Public Schools ("CPS") contracts awarded to her employer, Tru-Lite Window Company, Inc. ("Tru-Lite"). Cavanaugh has moved the court to dismiss all four indictment counts, arguing that the government's evidence is insufficient to demonstrate that she intended to defraud the Board of Education of Chicago (the "Board"). For the reasons discussed below, the court denies Cavanaugh's motion.

**BACKGROUND**

This case arises out of Cavanaugh's alleged participation in a scheme to circumvent contracting requirements established by the Board's Minority and Women Owned Business Enterprise ("MBE/WBE") Procurement Program (the "Program"). The Program established a goal of awarding not less than 26% of the total annual dollar value of competitively bid CPS contracts to minority-owned businesses.[1] Indictment ¶ 1(f). To meet that goal, the Board required that individual CPS contracts contain provisions requiring that at least 26% of the contract's dollar value be directed to minority-owned businesses. *Id.* at ¶1(j). Bidders demonstrated compliance with this requirement by completing forms that identified the subcontractors they intended to use to achieve Program goals and the percentage of the work each subcontractor would perform. *Id.* at ¶ 1(k).

---

[1] The Program also aimed to award not less than 5% of the total annual dollar value of competitively bid purchasing and construction contracts to businesses owned by women. Indictment ¶ 1(f).

These subcontractors, in turn, demonstrated minority-controlled status by submitting an MBE-certification application to the Office of Business Diversity showing that the applicant company satisfied certain ownership and control requirements. *Id*. at ¶ 1(I). Alternatively, contract bidders could obtain full or partial waivers of MBE participation after demonstrating a good faith attempt to comply with Program goals. *Id*.

At all times relevant to the Indictment, Cavanaugh worked as an accountant for Tru-Lite, an Illinois window-replacement business run by her co-defendant, Joseph Doyle. *Id*. at ¶ 1(a)–(b). On or about July 3, 1996, Tru-Lite bid for an $11 million CPS contract to install aluminum windows, asking CPS to waive Program requirements because Tru-Lite employees were "specially trained to perform this particular work." *Id*. at ¶ 4. The Board awarded the contract to Tru-Lite on or about July 24, 1996, but only partially waived Program requirements, permitting Tru-Lite to subcontract a smaller percentage of contract work than was contemplated by the Program.[2] *Id*. at ¶ 5–6. Then, in July 1998, Tru-Lite bid for and was awarded a $6 million extension of the prior CPS contract, and Tru-Lite was again required to submit forms demonstrating Program compliance. *Id*. at 7–8. For reasons not disclosed in the Indictment, Doyle was unable or unwilling to work with the minority-owned business that had performed work under the original contract, identified only as "Company A" in the Indictment. Instead, Tru-Lite represented in its bid materials that another minority-owned company, Quality Window Installation, Inc. ("Quality"), would perform the required percentage (6.4%) of the extension-contract work. *Id*. at ¶ 7.[3]

Quality was ostensibly owned and operated by Andre G. Prophet, an African-American who

---

[2] "Company A," a minority owned business, was slated to perform 6.4% of the contract work, and two other minority-owned business (and one woman-owned business) were slated to perform another 3.6% of the work. Indictment ¶ 6. The Indictment does not contain any allegations of impropriety with respect to Tru-Lite's performance under this initial contract.

[3] Tru-Lite's bid indicated that a second minority-owned business, "Company B," would perform 2% of the contract, and that "Company C," a woman-owned business, would perform another 1.6%. Indictment ¶ 7.

was also at that time a Tru-Lite employee. *Id.* at ¶¶ 1(d), 9. The government alleges that Quality was, in fact, a sham corporation controlled by Defendant Doyle, whose own company (Tru-Lite) did not satisfy MBE requirements, and that Doyle and Cavanaugh misrepresented Quality's minority-owned status in order to obtain the $6 million contract extension. *Id.* at ¶ 11. In a February 1998 meeting, Doyle and Cavanaugh allegedly offered to help Prophet form his own company and promised that Tru-Lite would subcontract CPS work to the new business. *Id.* at ¶ 12. According to the Indictment, Doyle and Cavanaugh chose the name, "Quality Window," and made all of the decisions and performed most of the work associated with starting the new business. *Id.* at ¶ 13–22. Defendants directed Prophet to open a business checking account with a $100 Tru-Lite check. *Id.* at ¶ 16. They prepared and submitted paperwork incorporating and licensing Quality, and again paid the necessary fees with Tru-Lite checks. *Id.* at ¶ 17. They told Prophet to obtain insurance through Tru-Lite's insurance agent and directed the agent to send premium bills to Cavanaugh, who paid the premiums with Tru-Lite funds. *Id.* at ¶ 19.

Significantly, from the government's perspective, Cavanaugh also prepared Prophet's MBE paperwork, which stated that Prophet controlled Quality—"making financing decisions regarding check signing, the hiring and firing of management and non-management personnel, supervision of field production, and supervision of office personnel"—even though she allegedly knew that his actual participation in the company was negligible. *Id.* at ¶ 20. The government also cites MBE paperwork stating that Prophet contributed $500 from his personal savings account to purchase Quality shares, when in fact Tru-Lite was the source of those funds. *Id.* at ¶ 21. Based on these alleged misrepresentations, Quality received MBE certification and CPS awarded Tru-Lite the contract extension. *Id.* at ¶ 22–23.

After Quality began work on the CPS project using Tru-Lite employees, Prophet's role within the company remained limited, at best. *Id.* at ¶ 25. Contrary to statements in Quality's MBE application, personnel decisions were controlled by Doyle, not Prophet. *Id.* Without Prophet's

3

authorization, Doyle and Cavanaugh distributed checks in Quality's name to Tru-Lite employees, some of whom did not work at the schools that were being billed for Quality's work. *Id.* at 25–26. Over time, Prophet grew increasingly frustrated with his limited role in what he believed to be his own company, and raised the issue with Doyle on several occasions. *Id.* at 29. Apparently in response to Prophet's complaints, Doyle fired Prophet from Tru-Lite and Quality in or about December 1998. *Id.* Nevertheless, the Indictment alleges that Doyle and Cavanaugh continued to act on Quality's behalf, apparently using Prophet's signature stamp to execute lien waivers which the Board required as a condition of final payment. *Id.* at ¶¶ 3, 30.

On August 2, 2005, Doyle pleaded guilty to Count I of the Indictment. This court has sentenced him to two years' probation and ordered restitution of $89,304.00 to the Board. Cavanaugh is scheduled to stand trial for her alleged participation in the scheme to defraud the Board on June 12, 2006.

## **DISCUSSION**

Relying on evidence outside the four corners of the Indictment, Cavanaugh contends that no reasonable jury could find beyond a reasonable doubt that she intended to defraud the Board. Cavanaugh asserts that she participated in Quality's formation because her employer, Doyle, instructed her to do so, and that nothing about that routine process indicated to her that the company was a sham. *See* Motion of Mary Cavanaugh to Dismiss the Indictment (hereinafter, "Motion to Dismiss"), at 2–6. Cavanaugh also argues that the government was called upon to present evidence concerning her culpability at Doyle's sentencing hearing, but failed to do so. *Id.* at 11–14. In his sentencing memorandum, Doyle took the position that, under the Sentencing Guidelines, his offense level could be increased for supervising the alleged scheme only if Cavanaugh was herself "criminally responsible" for the offense. *See* Def. Joseph Doyle's Sentencing Mem., Ex. 13 to Motion to Dismiss, at 13–15. Based upon the government's decision not to address her culpability at the hearing, Cavanaugh infers that the government cannot make

4

out its case against her.[4]  Motion to Dismiss at 12–14.  Cavanaugh also points out that Doyle's attorney, acting on his client's behalf, stated in Doyle's sentencing memorandum that "he does not believe that Mary Cavanaugh committed any crime by any of the activities he concededly directed her to do."  *Id.* at 10 n.8.  For its part, the government declines to address the substance of its case, arguing instead that it is premature to address the sufficiency of the evidence before trial.  Gov't's Response to Def. Mary Cavanaugh's Motion to Dismiss the Indictment, at 1–2.

> **A.    Motion to Dismiss Standard**

Cavanaugh has moved to dismiss the Indictment pursuant to FED. R. CRIM. P. 12.  Ordinarily, an indictment is tested before trial "solely by its sufficiency to charge an offense, regardless of the strength or weakness of the government's case."  *United States v. Risk*, 843 F.2d 1059, 1061 (7th Cir. 1988).  An indictment is constitutionally sufficient if it: (1) states "each of the elements of the crime charged;" (2) provides "adequate notice of the nature of the charges so that the accused may prepare a defense;" and (3) "[allows] the defendant to raise the judgment as a bar to future prosecutions for the same offense."  *United States v. Fassnacht*, 332 F.3d 440, 444–45 (7th Cir. 2003).  Cavanaugh does not dispute that the Indictment satisfies this standard.  *See, e.g., United States v. Stout*, 965 F.2d 340, 344–45 (7th Cir. 1992) (upholding indictment that stated the mail fraud elements (a scheme to defraud and use of the mails to further that scheme), and fairly apprised the defendant of the factual predicate for the charge).  Instead, Cavanaugh asks the court to assess the "strength or weakness of the government's case," *Risk*, 843 F.2d at 1061, and conclude that "no rational finder of fact can find that Mrs. Cavanaugh possessed the intent required

---

[4]  Although not relevant to the court's ultimate decision, *see infra*, the court notes that Doyle's attorney expressly disavowed making any representations about Cavanaugh's state of mind at Doyle's sentencing hearing.  *See* Transcript of Proceedings - Sentencing Before the Honorable Rebecca R. Pallmeyer (hereinafter, "Sentencing Tr."), Ex. 16 to Motion to Dismiss, at 18 ("What Mary Cavanaugh did or didn't do or what was on her mind and wasn't on her mind, we make no suggestion, argument, or comment.").  Without addressing Cavanaugh's culpability, the court concluded that the "leadership" sentence enhancer was appropriate because Doyle was "directing the activities of others."  *Id.* at 23.

5

to convict her beyond a reasonable doubt." Motion to Dismiss at 1.

### B. Sufficiency of the Evidence

The critical issue in this case is whether the government can prove that Cavanaugh, acting at her employer's behest, had the requisite intent to support a mail-fraud conviction. The court's own views on that matter are not now relevant. The law is clear that arguments addressed to the sufficiency of the government's evidence are premature. *See United States v. Thomas*, 150 F.3d 743, 747 (7th Cir. 1998) ("Summary judgment does not exist in criminal cases."); *see also United States v. Yakou*, 428 F.3d 241, 246 (D.C.Cir. 2005) ("There is no federal criminal procedural mechanism that resembles a motion for summary judgment in the civil context.").

Cavanaugh chiefly relies on three cases for the contention that the court should nevertheless look behind the Indictment to address the factual sufficiency of the government's case. *See United States v. Risk*, 843 F.2d 1059 (7th Cir. 1988); *see also United States v. Yakou*, 428 F.3d 241 (D.C.Cir. 2005); *United States v. Alfonso*, 143 F.3d 772 (2d Cir. 1998). In this court's view, none of these cases authorize the court to weigh the evidence and assess, prior to trial, whether the government can prove its case. The defendant in *Risk* was accused of failing to file Currency Transaction Reports ("CTR") as required by 31 U.S.C. §§ 5313 and 5322 . *Risk*, 843 F.2d at 1060. During voluntary discovery, the government disclosed documents which showed that none of the relevant transactions totaled more than $10,000, a necessary factual predicate for a CTR violation. *Id.* at 1060–61. The government conceded that the documents accurately summarized the "facts which [gave] rise to the indictment," and the district court dismissed the indictment based upon those undisputed facts. *Id.* at 1060. On appeal, the government objected to the district court's consideration of extrinsic evidence on defendant's motion to dismiss, but the court concluded that objection was waived where the government not only "did not object to Risk's submission of these facts," but itself submitted additional evidence to support its motion to reconsider the district court's decision. *Id.* at 1061.

Significantly, the *Risk* court concluded that the district court had not dismissed the "indictment because the government could not prove its case," as Cavanaugh urges this court to do here. *Id.* On the contrary, the district court found, based on undisputed evidence that none of the transactions at issue exceeded $10,000, that the allegations in the indictment were "insufficient to state a claim under the CTR statute." *Id.* In other words, the district court dismissed the indictment "not because the government could not prove its case, but because there was no case to prove." *Id.* The Seventh Circuit held that, in considering evidence outside the indictment, the district court had acted properly "[u]nder the unusual circumstances of this case." *Id.*; *accord United States v. Brown*, 925 F.2d 1301, 1304 (10th Cir. 1991).

In *Yakou*, the District of Columbia Court of Appeals followed the reasoning in *Risk* and similar cases in upholding the district court's "dismissal of the indictment based on a question of law where the government has not made a timely objection." *Yakou*, 428 F.3d at 247. The defendant in *Yakou* was accused of having "negotiated and arranged for the sale, purchase, transfer, and construction of six armored patrol boats for the government of Iraq" in violation of the Arms Export Control Act ("AECA") and its implementing regulations, the International Traffic in Arms Regulations ("ITAR"). *Id.* at 245. Based upon the undisputed facts underlying the indictment, the district court concluded that the defendant had voluntarily relinquished his lawful-permanent-resident status, and, accordingly, dismissed the indictment because the defendant was not a "U.S. person" as required by the AECA and ITAR. *Id.* at 246. The appeals court affirmed, concluding that the definition of "U.S. person" was a question of law, and that the government had not raised its procedural objection in the district court. *Id.* at 247, 254.

Finally, in *Alfonso*, the Second Circuit, applying an ostensibly different standard than the *Risk* and *Yakou* courts, nevertheless concluded that the defendant's motion to dismiss was premature. *Alfonso*, 143 F.3d at 776–77. The district court in *Alfonso* had concluded that the

7

government's evidence was insufficient to satisfy the Hobbs Act's jurisdictional element. *Id.* at 775.[5] The Second Circuit reversed, concluding that the government had not made a "full proffer" of its evidence. *Id.* at 777. On this basis, the court distinguished one of its own earlier decisions affirming "dismissal of an indictment for failure to satisfy the jurisdictional element of the federal arson statute." *Id.* (citing *United States v. Mennuti*, 639 F.2d 107 (2d Cir. 1981)(abrogated on other grounds by *Russell v. United States*, 471 U.S. 858 (1985)).

Cavanaugh argues that in this case the government has effectively made a "full proffer" of its evidence, speculating that any additional materials produced between now and trial will be substantially the same as documents already produced. Reply in Support of Motion of Mary Cavanaugh to Dismiss the Indictment, 2–3. The court believes that Cavanaugh's reading of *Alfonso's* "full proffer" language is overbroad. In *Mennuti*, the case that the Second Circuit distinguished in *Alfonso*, the government had filed an affidavit containing all the information that it intended to present at trial concerning jurisdiction. *See Mennuti*, 639 F.2d at 108 n.1. Essentially, the government consented to a pretrial determination of the arson statute's jurisdictional element. *Id.*; s*ee also United States v. DeLaurentis*, 230 F.3d 659, 660–61 (3d Cir. 2000) (court may consider the sufficiency of the government's evidence if there is a "stipulated record"). In this respect, the *Alfonso* court's "full proffer" requirement is similar to the standard applied in both *Risk* and *Yakou*, where the government, by failing to object in the district court, impliedly consented to that court's decision to consider facts outside the indictment. *See Risk*, 843 F.2d at 1061; *Yakou*, 428 F.3d at 247.

Here, the government has objected to a pretrial determination of the sufficiency of the evidence, taking this case outside the narrow exception, created by the Seventh Circuit in *Risk*, to

---

[5] Specifically, the district court concluded that the government had "not adduced sufficient facts to establish a nexus between the robbery allegedly committed by [defendants] and any obstruction of interstate commerce." *Alfonso*, 143 F.3d at 773.

the general rule that the district court should not consider the sufficiency of the government's evidence in ruling on a motion to dismiss an indictment. *See Risk*, 843 F.2d at 1061; *see also United States v. Knox*, 396 U.S. 77, 83 n.7 (noting that Rule 12(b)(1) indicates that evidentiary questions, such as whether false statements were made willfully under 18 U.S.C. § 1001, "should not be determined" on a motion to dismiss an indictment). Morever, intent under the mail fraud statute "is clearly a question of fact," *United States v. Mascio*, 774 F.2d 219, 221 (7th Cir. 1985), unlike the legal question at issue in *Yakou*. *Yakou*, 428 F.3d at 247; *see also United States v. Yasak*, 884 F.2d 996, 1001 n.3 ("A defense is generally capable of determination before trial if it involves questions of law rather than fact."). Indeed, as both Cavanaugh and the government agree, intent is the ultimate question of fact in this case. *See* FED. R. CRIM. P. 12(b)(2)("A party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial of the general issue."); *Yasak*, 884 F.2d at 1001 n.3 ("If the pretrial claim is substantially intertwined with the evidence concerning the alleged offense, the motion to dismiss falls within the province of the ultimate finder of fact."). Accordingly, the government is "entitled to marshal and present its evidence at trial and have its sufficiency tested by a motion for acquittal pursuant to Federal Rule of Criminal Procedure 29." *DeLaurentis*, 230 F.3d at 661.

## **CONCLUSION**

Cavanaugh's motion to dismiss the Indictment (64-1) is denied.

ENTER:

Dated: April 11, 2006

REBECCA R. PALLMEYER
United States District Judge